3 F.3d 1043
 Bankr. L. Rep. P 75,398
In the Matter of SPECIALTY EQUIPMENT COMPANIES, INC., a
Delaware corporation, and SPE Acquisition, Inc., a
Delaware corporation, Debtors-Appellees,
and
Official Unsecured Creditors Committee, Intervening Appellee,
and
General Electric Capital Corporation, Mitsui Nevitt Capital
Corporation, Credit Du Nord, Sun Life Insurance
Company of America, and Wells Fargo
Bank, the Senior Lenders, Appellees.
Appeal of Melvin C. NIELSEN, Peter C. Kostantacos, and Shirlie Crooks.
 No. 92-3643.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 4, 1993.
Decided Aug. 23, 1993.
 
 Bradley T. Koch, Kim M. Casey (argued), Holmstrom & Kennedy, Rockford, IL, Georgia Vlahos, Terrence Buehler, Susman, Saunders & Buehler, Chicago, IL, for appellants.
 Ray Thek, Louis Kahn, David F. Johnson, Cleary, Gottlieb, Steen & Hamilton, New York City, Bernard J. Natale, Stewart Square, Rockford, IL, for appellees.
 James E. Spiotto, Barbara C. Klabacha, Peter A. Clark, Chapman & Cutler, Chicago, IL, for intervenor-appellee.
 John Collen (argued), Michael D. Rosenthal, Sonnenschein, Nath & Rosenthal, Chicago, IL, Kenneth F. Ritz, Ritz, Shair & Anderson, Rockford, IL, for debtor-appellee.
 Before CUDAHY, FLAUM, and KANNE, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 Specialty Equipment Companies, Inc. and its parent SPE Acquisition, Inc. ("Debtors") commenced a bankruptcy case on December 24, 1991 by filing voluntarily for reorganization under Chapter 11 of the Bankruptcy Code. Melvin C. Nielsen, Peter C. Kostantacos, and Shirlie Crooks ("Appellants") are appealing from two orders entered by the bankruptcy court: a denial of the motion of Nielsen and Kostantacos to withdraw certain acceptances pursuant to Bankruptcy Rule 3018, and the denial of Crooks's objection to the plan of reorganization and confirmation of a Chapter 11 plan that provided for the release of third-party nondebtors by each creditor voting to accept that plan. Before the district court, appellees (the Debtors, the Official Unsecured Creditors Committee, and the Senior Lenders) successfully moved to dismiss this appeal as moot on the grounds that the Plan is substantially consummated. We affirm.
 
 I.
 
 2
 Crooks, a member of a class of investors putatively represented by Nielsen and Kostantacos, acquired 13.75% Senior Subordinated Debentures issued in a $150 million offering by Specialty Equipment. On October 11, 1991, Nielsen and Kostantacos filed a securities fraud class action against General Electric Capital Corporation ("GECC"); Piper, Jaffray & Hopwood; and Kidder, Peabody & Co., apparently stemming from the issuance of the debentures during a leveraged buyout in 1988. Nielsen and Kostantacos are seeking compensatory and rescissionary damages on behalf of all present and former owners of Specialty Equipment's $150 million debenture offering.[1] Debtors filed their Chapter 11 petitions on December 24 and their disclosure statement and joint plan of reorganization ("Plan") on December 26. This Plan was the product of more than a year of negotiations between Debtors and their major creditors, including GECC, who had claims of more than $250 million in secured debt, and an unofficial committee representing a majority (approximately 75% of the outstanding principal) of the $150 million in principal of the Debtors' 13.75% debentures. The negotiations also led to the December 21 signing of a Consent and Standstill Agreement by the Debtors and the Senior Lenders and certain large institutional holders of the debentures (representing approximately 50% of the outstanding principal). The Standstill Agreement bound Debtors' principal creditors to support and vote for the Plan and also contained a mutual release of claims executed by each of the parties that would be effective upon consummation of the Plan.
 
 
 3
 On January 9, 1992, the United States Trustee appointed an Official Unsecured Creditors Committee to represent the interests of all unsecured creditors of Debtors, including all debentureholders. This committee consisted of two trade creditors and six debentureholders. The debentureholders on this committee collectively controlled 44% of the principal amount of debentures. All six debentureholders were part of an Ad Hoc Debenture Committee which was involved in the negotiation of the Chapter 11 Plan with Debtors and the Senior Lenders. Five of the six debentureholders were party to the Standstill Agreement. Appellants were not party to the Standstill Agreement nor were they members of the Ad Hoc Debenture Committee or the Official Unsecured Creditors Committee.
 
 
 4
 The primary provisions of the Plan, as approved in the Confirmation Order, include: (1) payment in full of priority and general unsecured claims (approximately $163 million); (2) a debt-for-equity swap of $150 million (in principal amount) of debentures for over 96% of the common stock of the reorganized company; (3) a restructuring of approximately $250 million of senior secured loan obligations; (4) an extension of $10 million in additional credit by two former institutional debentureholders; (5) the cancellation of all claims and interests junior to general unsecured claims, including claims for damages or rescission based on the sale of the debentures, which are subordinated to the claims of general unsecured creditors under section 510(b) of the Bankruptcy Code. In addition, the Plan provides that all creditors voting in favor of the Plan are deemed to give Releases to a number of third parties (including the Senior Lenders, Debtors' management and underwriters involved in the 1988 leveraged buyout involving the Debtors) from any liability arising out of a relationship with the Debtors. Creditors who abstained or voted against the Plan are deemed not to have granted the Releases.
 
 
 5
 Ultimately, creditors and interest holders entitled to vote overwhelmingly accepted the Plan. Senior Lenders voted unanimously to accept the Plan. Eighty-three debentureholders, whose claims total $115,713,000 voted in favor of the Plan; four debentureholders with holdings of $1,207,000 voted against the Plan. However, on February 3, 1992, Nielsen and Kostantacos filed written objections to Debtors' disclosure statement, maintaining that the Releases were a prohibited discharge of third-party debt and that the disclosure statement failed to describe adequately the pending litigation. The bankruptcy court overruled these two objections, holding that the validity of the Releases was a plan confirmation issue and that the disclosure with respect to the litigation was adequate. The bankruptcy court approved the disclosure statement on February 5, and no appeal was taken from that order. On February 19, Nielsen and Kostantacos filed a motion seeking to solicit creditors not to accept the Plan. A letter was then distributed requesting the debentureholders to abstain from voting on the Plan. Apparently in response to this abstention letter, three debentureholders who previously had voted in favor of the Plan, including Crooks, attempted to revoke their acceptance ballots. The bankruptcy court denied this motion on March 12, 1992.
 
 
 6
 Prior to the confirmation hearing, Crooks also filed a written objection to the Plan, in which she argued that the bankruptcy court lacked authority to grant the Releases. The bankruptcy court concluded that Crooks' affirmative vote deprived her of standing to object to the confirmation. After the hearing, the bankruptcy court confirmed the Plan. Rather than seeking a stay, Crooks, Nielsen, and Kostantacos appealed the orders of the bankruptcy court to the district court. Debtors moved to dismiss the appeal on the grounds that appellants lack standing to pursue the appeal and that the appeal was moot.[2] Agreeing with appellees that the Plan was substantially consummated, the district court dismissed the appeal as moot.
 
 II.
 
 7
 In their principal argument, the appellants have raised what they have labelled a jurisdictional challenge. Essentially, they contend that the bankruptcy court acted contrary to section 524(e) of the Bankruptcy Code in approving that portion of the Plan releasing non-debtor third parties from liability. As a preliminary matter, we note that a bankruptcy court does have the power to determine the legality of provisions, including releases, incorporated into a reorganization plan. See, e.g., In re AOV Industries, Inc., 792 F.2d 1140, 1145 (D.C.Cir.1986); see also 28 U.S.C. Sec. 157(b)(2)(L). In fact, appellants are not so much challenging the bankruptcy court's subject matter jurisdiction, which is quite broad under section 105(a), as they are the legitimacy of the Releases included in the Plan.
 
 
 8
 The major concern lurking in the appellants' ostensible jurisdictional argument is the effect of these Releases. Relying on Union Carbide Corp. v. Newboles, 686 F.2d 593 (7th Cir.1982) (per curiam), appellants seem to be arguing that the Releases effectively discharge nondebtors from liability, which they believe to be contrary to section 524(e) of the Bankruptcy Code. Section 524(e) provides in relevant part that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. Sec. 524(e). In a chapter 11 case, the debtor receives its discharge as to all of its debts, as defined in section 524, upon entry of the order of confirmation. See id. Sec. 1141(d)(1). The provisions of the confirmed plan bind all creditors whether or not a particular creditor has voted to accept the plan. Id. Sec. 1141(a); see Republic Supply Co. v. Shoaf, 815 F.2d 1046 (5th Cir.1987). Since confirmation may be achieved over the dissent of individual creditors, see 11 U.S.C. Sec. 1126, and even over the objection of an entire class of creditors, see id. Sec. 1129(b), a debtor's discharge may occur despite the objection of particular creditors. See Union Carbide, 686 F.2d at 595. Section 524(e) acts as a limitation on the effect of this discharge.
 
 
 9
 In Union Carbide the reorganization plan provided for the "settlement, satisfaction and discharge" against individual third-party guarantors in exchange for distributions of proceeds from the property of the debtor. Subsequently, when one of the creditors sued the guarantors on the guaranty, the guarantors contended that creditors' approval of the reorganization plan worked an accord and satisfaction under Indiana law and thereby eliminated their liability on the guaranty. Relying on Section 16 of the Bankruptcy Act of 1898, which is more explicit than section 524(e) of the current Bankruptcy Code,[3] the court held that the statute specifically prohibited the discharge of the guarantors, irrespective of the provision in the reorganization plan to the contrary. The Union Carbide court concluded in summary fashion that the purpose of Section 16 was to prevent a creditor from being forced to lose his claim against a third party involuntarily and without consideration:
 
 
 10
 A bankruptcy discharge arises by operation of federal bankruptcy law, not by contractual consent of the creditors.... A creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings, simply because the gamesmanship imported by state contract law into the bankruptcy proceedings would be intolerable. Since a majority of the creditors must approve the debtor's plan for the debtor to be discharged, in many instances one creditor's approval or disapproval will have no effect even in the bankruptcy proceeding.... Similarly, the payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release nonparty obligors.
 
 
 11
 Id. at 595 (citations omitted); accord Underhill v. Royal, 769 F.2d 1426, 1432 (9th Cir.1985) (federal bankruptcy laws do not operate as a contract to relieve co-debtors of liabilities); In re Future Energy Corp., 83 B.R. 470 (Bankr.S.D.Ohio 1988) (plan provision in reorganization releasing plan proponents from third-party claims violates section 524(e)).
 
 
 12
 The Union Carbide court considered the release at issue invalid because the person gratuitously released by the reorganization plan was a contractual co-debtor who did not contribute to the plan. In light of the express language of Section 16, the court was especially concerned about protecting a creditor's specific contractual rights against a third-party obligor in a reorganization plan that purported to grant that guarantor a release without according the creditor any unique consideration on account of the guaranty.[4] Moreover, while section 524(e) has generally been interpreted to preclude the discharge of guarantors, the statute does not by its specific words preclude all releases that are accepted and confirmed as an integral part of a reorganization. See, e.g., In re A.H. Robins, Inc., 880 F.2d 694, 702 (4th Cir.1989); see also Shoaf, 815 F.2d at 1050 (section 524(e) objection must be noted prior to confirmation as a final and unappealed confirmation order may, by virtue of res judicata, discharge a guarantor).
 
 
 13
 Appellants seem to be arguing for a much broader reading of section 524(e), one that would effectively preclude a reorganization plan from granting releases to any party other than the debtor. But section 524(e) provides only that a discharge does not affect the liability of third parties. This language does not purport to limit or restrain the power of the bankruptcy court to otherwise grant a release to a third party. While a third-party release, like the one in Union Carbide releasing a co-debtor from liability, may be unwarranted in some circumstances, a per se rule disfavoring all releases in a reorganization plan would be similarly unwarranted, if not a misreading of the statute. Accordingly, courts have found releases that are consensual and non-coercive to be in accord with the strictures of the Bankruptcy Code. See, e.g., AOV Industries, 792 F.2d at 1145; In re Monroe Well Service, Inc., 80 B.R. 324 (Bankr.E.D.Pa.1987). Unlike the injunction created by the discharge of a debt, a consensual release does not inevitably bind individual creditors. It binds only those creditors voting in favor of the plan of reorganization.
 
 
 14
 Although these releases in their various forms do pose a rather knotty problem, it is not one that we need to unravel completely inasmuch as the Releases granted in the Debtors' reorganization are consensual. According to the terms of the Plan, each creditor could choose to grant, or not to grant, the release irrespective of the vote of the class of creditors or interest holders of which he or she is a member. As a consequence, a creditor who votes to reject the Plan or abstains from voting may still pursue any claims against third-party nondebtors. Since Nielsen and Kostantacos abstained, they may continue to pursue the class action. In this regard, vacating only Crooks's release (or more accurately, her acceptance) would neither change significantly the composition of the plaintiff class in the pending litigation nor have an impact on the acceptance vote. On the other hand, invalidating all the Releases of the bondholder class to which Crooks belongs would have a much more palpable effect on the bargain struck in the reorganization, the issue to which we now turn.
 
 III.
 
 15
 Appellees, questioning whether we even need to revisit the Releases, contend that substantial consummation of the Plan has mooted the issue on appeal. In their brief, the Debtors have taken the maximum position by arguing that appellants' failure to seek a stay under Bankruptcy Rule 8005 after the confirmation order issued from the bankruptcy court is fatal to their cause. See Fed.R.Bankr.P. 8005. Although a number of courts have viewed with disapproval the failure to obtain a stay of a plan of reorganization, see, e.g., In re Information Dialogues, Inc., 662 F.2d 475 (8th Cir.1981); In re Roberts Farms, Inc., 652 F.2d 793 (9th Cir.1981); In re Texaco, Inc., 92 B.R. 38 (S.D.N.Y.1988), there is no general requirement of doing so as a precondition for an appeal. AOV Industries, 792 F.2d at 1147. Nonetheless, a party that elects not to pursue a stay subsequent to confirmation risks that a speedy implementation of the reorganization will moot an appeal. See Mills v. Green, 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895) ("[W]hen, pending an appeal from the judgment of a lower court, ... an event occurs which renders it impossible for the [appellate] court, if it should decide the case in favor of plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal [as moot]."). Furthermore, the sweep of a plan of reorganization may frequently encompass and moot issues central to a bankruptcy proceeding that fall outside the literal words of the bankruptcy rules, such as releases.[5]
 
 
 16
 The parties in the present case have proceeded swiftly to implement the Plan since its confirmation. In concluding that the appeal was moot, the district court relied on a standard for mootness in bankruptcy proceedings adopted in other circuits. See Miami Center Ltd. Partnership v. Bank of New York, 838 F.2d 1547, 1554-55 (11th Cir.), cert. denied, 488 U.S. 823, 109 S.Ct. 69, 102 L.Ed.2d 46 (1988); AOV Industries, 792 F.2d at 1147-50; see also In re Andreuccetti, 975 F.2d 413 (7th Cir.1992). Applying this mootness standard in the context of a reorganization, "the court may consider the virtues of finality, the passage of time, whether the plan has been implemented and whether it has been substantially consummated, and whether there has been a comprehensive change in circumstances." Miami Center Ltd., 838 F.2d at 1555 (citing AOV Industries, 792 F.2d at 1148-49). The mootness doctrine allows a reviewing court to strike an appropriate balance between the equitable notions of finality and good faith reliance on a judgment, and the competing interests that underlie the right of a party to seek review of an adverse ruling by a bankruptcy court. In essence, these considerations represent various components of the basic inquiry into whether the plan of reorganization has been substantially consummated at the time of the appeal. Of course, a number of subsidiary elements do enter into this calculus, including whether the appellants have sought a stay, the nature of the relief sought, and the impact of the relief on the debtor as well as third parties.
 
 
 17
 Consistent with the requisite inquiry called for in Andreuccetti, the district court in the present case found that the appeal was moot on the grounds of substantial consummation. See Andreuccetti, 975 F.2d at 418. In reaching this conclusion, the district court identified a whole series of transactions contemplated in the Plan that have already occurred. Cash payments of approximately $13 million were made to creditors holding priority and general unsecured claims. Senior Lenders have perfected security interests in SPE's assets in exchange for $230 million in loans and have waived their claim for approximately $11 million in default interest. SPE, the reorganized entity, has completed the debt-for-equity swap. Furthermore, SPE has entered into new contracts and has incurred new trade debt. In short, all material aspects of the Plan have been implemented. SPE's capital structure has been revised, and the reorganized entity has reentered the stream of commerce. If the Releases constitute an integral element of the bargain represented by the Plan, then substantial consummation of the Plan would preclude the sort of challenge raised by appellants.
 
 
 18
 Appellants contend that the Releases are not integral to the Plan. They reason that the parties to the Standstill Agreement (the Debtors, the Senior Lenders, and institutional debentureholders) never conditioned their support for the Plan on obtaining the Releases; therefore, those parties cannot assert reliance at this juncture. The Plan, pre-negotiated, was appendixed to the Standstill Agreement. The sole provision in the Standstill Agreement that concerned modifications to the Plan prohibited a party from materially changing any agreements governed by the Standstill Agreement. According to appellants, the Standstill Agreement nowhere states that a court's invalidation of the Releases constitutes a ground for terminating the Agreement. Furthermore, appellees, who were aware that not every release provision has met with the approval of bankruptcy courts, did not make inclusion of the Releases a condition precedent to the effectiveness of the Standstill Agreement. Thus, the parties to the Standstill Agreement would have been obligated to vote for the Plan and otherwise perform under the Agreement even if the bankruptcy court had invalidated or disallowed the Releases. In the same vein, the effectiveness of the Standstill Agreement is not conditioned on obtaining a certain number of Releases. Thus, even if all debentureholders who were not parties to the Standstill Agreement abstained from voting for the Plan, appellees nevertheless remained committed to vote for it.
 
 
 19
 Appellants appear to be misconstruing both the Plan and the relationship between the Standstill Agreement and the Plan. Under the Standstill Agreement, the parties agreed to support the pre-negotiated Plan, in exchange for mutual releases, as long as there was no material adverse change in the rights and interests of any of the parties or any material modification of the proposed Plan. As a result of this pre-petition Agreement, the Senior Lenders, for example, received contractual releases from bondholders owning less than 50 percent of the Debtor's outstanding debentures. These contractual releases, however, are not identical to those provided for in the Plan. According to the terms of the Plan, all bondholders who voted in favor of the Plan would thereby be granting a Release of any claims that they might have against third parties. App. at 24-25. In order for the Plan to be approved, the Debtors had to obtain the acceptance of the bondholder class, which meant at least two-thirds in amount and 50 percent in number of bondholder class members voting on the Plan. Had the Plan not been confirmed, the Standstill Agreement would have expired by its terms, and all parties to the Agreement would have been free to pursue their own remedies, such as foreclosure on Specialty's assets. Consequently, while the parties to the Standstill Agreement agreed to provide mutual releases, they recognized that the validity of the Standstill Agreement and ultimately the confirmation of the Plan required acceptance by the class of bondholders, including the receipt of the voluntary Releases under the Plan from other bondholders. In this way, the Plan embodied an independent expectation with respect to outstanding litigation. The Releases serve the objectives of the Plan by facilitating the resolution of claims, such as the one appellants are pressing, among or against the parties with respect to the Debtors and their reorganization and by reducing the likelihood of Debtors' becoming involved in costly and time-consuming litigation, including post-confirmation contribution and indemnification claims.
 
 
 20
 As matters now stand, appellants have done little more than suggest that the Releases are not integral to the Plan. They have argued in very general terms that these sorts of releases are invalid, a proposition too broad for us to embrace, while avoiding any substantial discussion of the pending class action and its relationship to the Releases. We are not confronting co-debtor liability, when a guarantor attempts to discharge gratuitously its own existing secondary liability on the coattails of a bankrupt debtor's discharge. The claim for relief in the pending class action is much more speculative. Without more, we can find no reason to extend the protection traditionally afforded creditors of co-debtors to the appellants. The Plan, including the Releases, represents a consensual arrangement arrived at through lengthy negotiation and designed to serve a number of goals. The vast majority of interest holders in the same class as Crooks, privy to the same information in the disclosure statement, voted to accept this Plan. Appellants have not shown that the Releases are not an essential part of the Plan nor have they offered any compelling reason for us to upset the bargain already struck. Nullification of the Releases at this juncture would amount to imposing a different plan of reorganization on the parties. Accordingly, because the Plan has been substantially consummated, this appeal is moot.
 
 
 21
 For the foregoing reasons, the decision of the district court is AFFIRMED.
 
 
 
 [1]
 On January 7, 1992, class representatives filed a motion for class certification which has been continued while the court considers several motions by the defendants
 
 
 [2]
 Before us appellees have again raised the issue of standing. In particular, they maintain that Nielsen and Kostantacos do not have standing since they never objected to confirmation of the Plan and that Crooks lacks standing because she voted to accept the Plan. Because we are deciding the case on mootness grounds, we decline to address this alternative argument
 
 
 [3]
 Section 16 of the Bankruptcy Act of 1898 provided that "[t]he liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt." 11 U.S.C. Sec. 34 (repealed October 1, 1979)
 
 
 [4]
 Although incidental to our resolution of this case, appellants believe that the consideration for the Releases is either nonexistent or inadequate. They contrast the Plan before us with the one in AOV Industries, by which creditors who voted in favor of the plan of reorganization, including releases of third-party nondebtors, were entitled to share in a distribution funded by those obtaining a release. AOV Industries, 792 F.2d at 1143. However, the absence of a specific fund for settling with releasing parties does not imply the absence of value being given
 
 
 [5]
 Appellants rely on Huddleston v. Nelson Bunker Hunt Trust Estate, 109 B.R. 197 (N.D.Tex.1989) for the proposition that an appeal that presents matters of subject matter jurisdiction cannot be mooted. First, we do not believe it is correct to characterize appellants' challenge as jurisdictional. Moreover, as counsel for appellants acknowledged at oral argument, Huddleston was more concerned with the due process rights of certain parties who had received no notice of the confirmation than with the scope of the bankruptcy court's jurisdiction. The limited holding of that case does not impede our consideration of the mootness doctrine here