

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-7-1996

# In Re Continental Airlines

Precedential or Non-Precedential:

Docket 94-7748

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"In Re Continental Airlines" (1996). *1996 Decisions.* Paper 228.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/228

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

No. 94-7748
_____


IN RE CONTINENTAL AIRLINES:

NATIONSBANK OF TENNESSEE, N.A., f/k/a NationsBank of Tennessee,
as Collateral Trustee under a Secured Equipment Indenture and
Lease Agreement dated March 15, 1987 ("NationsBank"); NEW JERSEY
NATIONAL BANK, as successor by merger to Constellation Bank,
N.A., f/k/a National State Bank of Elizabeth, N.J.; HARRIS TRUST
AND SAVINGS BANK; and BOATMAN'S FIRST NATIONAL BANK OF OKLAHOMA,
as First, Second and Third Priority Secured Equipment
Certificates Trustees thereunder, respectively (the "Series
Trustees" and, collectively with NationsBank, the "Trustees"),
                                                    Appellants


_____


On Appeal from the United States District Court
for the District of Delaware
C.A. No. 93-195-JJF
(Bankruptcy Nos. 90-932 through 90-984)
_____


Argued September 15, 1995

Before:  SLOVITER, Chief Judge,
ALITO and SEITZ, Circuit Judges

(Filed  February 7, l996)
_____

Gary S. Jacobson (Argued)
Nicholas J. DiCarlo
James G. Scotti
Kelley Drye & Warren
New York, NY 10178

        Attorneys for Appellant NationsBank
        of Tennessee

Hal L. Baume
Louis T. DeLucia
Norman Peer
Wilentz, Goldman & Spitzer

Woodbridge, NJ 07095

       Attorneys for Appellant New Jersey
       National Bank

Richard G. Elliott, Jr.
Daniel J. DeFranceschi
Richards, Layton & Finger
Wilmington, DE  19899

       Attorneys for Appellants Harris Trust
       and Savings Bank and Boatman's First
       National Bank of Oklahoma


Richard P. Schifter  (Argued)
Andrew T. Karron
Michael L. Bernstein
Kari M. Desgalier
Arnold & Porter
Washington, D.C. 20004

Laura D. Jones
Robert S. Brady
Young, Conaway, Stargatt & Taylor
Wilmington, DE  19899-0391

     Attorneys for Appellee

_____

OPINION OF THE COURT
_____

SLOVITER, <u>Chief Judge</u>.

## INTRODUCTION

Before us is an appeal by NationsBank of Tennessee (Collateral Trustee) a
Jersey National Bank, Harris Trust and Savings Bank, and Boatman's First National F
Oklahoma (First, Second, and Third Priority Secured Equipment Certificate Trustees)
are collectively referred to in this opinion as the "Trustees," from the order ente
the district court in the Chapter 11 bankruptcy proceeding of Continental Airlines,
dismissing as moot three appeals by the Trustees. Those appeals were from orders o
bankruptcy court which 1) denied the Trustees' Renewed Motion for adequate protecti
2) confirmed Continental's revised second amended joint plan of reorganization, and
denied the Trustees' motion for the establishment of a cash deposit of $123,479,287
essence, the Appellant Trustees seek payment for an asserted administrative claim o
approximately $117 million against the reorganized company. The Appellee, Continer
Airlines, Inc., defends the district court's mootness ruling and argues, in the
alternative, that the underlying rulings of the bankruptcy court were correct as a
of law and fact.

I.

## FACTUAL AND PROCEDURAL HISTORY

Continental filed its Chapter 11 bankruptcy petition on December 3, 1990.
Appellant Trustees serve as successor Collateral and Series Trustees for certificat
holders who had provided Continental with operating capital. The certificates were
secured at the time of Continental's petition by a pool of 29 commercial aircraft w
engines, and 81 additional jet engines which, we were advised, serviced about one-t

Continental's operating fleet.  Under the Bankruptcy Code, the debtor in possession

has most of the rights, powers, functions and duties of a trustee, see 11 U.S.C. §

1107(a), "may use property of the estate in the ordinary course of business without

or a hearing."  11 U.S.C. § 363(c)(1).

> Section 363(e) provides:
> Notwithstanding any other provision of this section, at any time, on requ
> an entity that has an interest in property used . . . by the [debtor in
> possession], the court, with or without a hearing, shall prohibit or cond
> such use . . . as is necessary to provide adequate protection of such int

11 U.S.C. § 363(e).

On February 21, 1991, First Fidelity Bank of New Jersey, predecessor to

NationsBank as Collateral Trustee, filed a motion along with many other aircraft le

and financiers alleging, inter alia, a decline in the value of the collateral and s

adequate protection under section 363(e).  First Fidelity later withdrew from this

but on June 28, 1991 it, and the predecessors of the other Appellant Trustees, file

motion seeking similar relief.  The bankruptcy court held an evidentiary hearing on

motion from September 3 through September 6, 1991 limited to the Trustees' assertio

they were entitled to adequate protection payments as a result of the collateral's

petition decline in market value.

Continental argued, inter alia, that because the Trustees had not filed a

for relief from the automatic stay, they were not entitled to an award of adequate

protection under section 363(e).  The bankruptcy court ruled on the Trustees' motio

August 27, 1992, rejecting that argument but finding as a fact, based on the "Blue

a publication issued by a company that appraises aircraft, that the market value of

collateral had not declined during the period at issue in the motion.  In re Contin

Airlines, Inc., 146 B.R. 536 (Bankr. D. Del. 1992) [hereinafter Continental I].

4

On August 14, 1992, approximately two weeks before the opinion in Contine[...] was issued, the Trustees filed a motion under section 362(d) of the Bankruptcy Code[...] lift the automatic stay ("Lift-Stay Motion").  See 11 U.S.C. § 362(d).  This sectio[...] permits a creditor to move for relief from the automatic stay of delineated activit[...] such as repossession of collateral, effected by section 362(a) of the Bankruptcy Co[...]

On September 14, 1992, the Trustees also filed a renewed motion for adequ[...] protection for alleged decline in the collateral's value for the period after Septe[...] 1991, when the original 1991 motion was argued ("Renewed Motion").  There were vari[...] hearings on the Renewed Motion between November 3, 1992 and February 5, 1993.  Towa[...] end of that period, the Trustees filed a motion dated January 29, 1993, asking the [...] bankruptcy court to establish a cash deposit of some $123 million, of which $117 mi[...] was attributable to alleged market decline, to preserve what the Trustees claimed w[...] administrative priority status of the Trustees' adequate protection claim if Contin[...] emerged from bankruptcy as a reorganized debtor ("Deposit Motion").

During this period efforts to reorganize the debtor continued.  On Novemb[...] 1992 Continental entered into an Investment Agreement under which the Investors (Ai[...] Partners, L.P. and Air Canada) agreed and committed to an investment of $450 millio[...] the reorganized entity under a complex arrangement and subject to certain condition[...] App. at 391 et seq.  One of those conditions relevant to this proceeding was a limi[...] on the amount and nature of liabilities and administrative expense claims required [...] assumed by or attributable to the reorganized company.  App. at 408.  On January 13[...] Continental filed a second amended joint plan of reorganization ("Plan") which refe[...] that Investment Agreement.  The Plan provided, inter alia, for assumption of "allow[...] administrative claims" by the reorganized Continental. App. at 656.

The confirmation hearing was held for a number of days during the period [...] 16, 1993 through April 16, 1993.  The parties reached a settlement on April 12 conc[...]

5

adequate protection due to use and/or maintenance of the collateral by Continental, issue relating to use decline (the impairment in value attributable to the use of t collateral by the debtor in possession) is before us. The parties did not settle t Trustees' adequate protection claims based on decline in market value.

At the conclusion of the confirmation hearing on April 16, 1993, the bank court denied the Deposit Motion and the Renewed Motion. In a published opinion, th held that it was necessary for the Trustees to have sought relief from the automati to be entitled to adequate protection for market value decline; that therefore the Trustees were not entitled to adequate protection due to market decline until after date of their Lift-Stay Motion, i.e. August 14, 1992; and that no decline in the ma value of the collateral had taken place since that date. In re Continental Airline Inc., 154 B.R. 176 (Bankr. D. Del. 1993) [hereinafter Continental II]. Also on Apr 1993, the bankruptcy court signed the Confirmation Order. The court made a series detailed findings of fact and conclusions of law underlying the Confirmation Order will be referred to throughout this opinion when pertinent.

On April 20, 1993 the Trustees filed three notices of appeal to the distr court from the bankruptcy court's denial of the Renewed Motion for Adequate Protect its denial of the Deposit Motion, and its order confirming the Plan. Two days late Trustees filed a motion for a partial stay of the consummation of the Plan ("Condit Stay Motion"), but filed that motion in the district court, which referred them to bankruptcy court. On April 26, 1993, the Trustees filed a stay request in the bank court. Because the bankruptcy judge was not available, the hearing on the motion w the next day in the district court, which ruled that the Trustees were likely to pr on appeal but denied the stay because the Trustees were "unable to post a bond satisfactory to the Court." App. at 1755-56. With no stay impeding implementation

Plan which had now been confirmed, the Investors proceeded to close the transaction making their promised investment.

On May 6, 1993 Continental filed a motion in the district court to dismiss Trustees' appeals as moot, which the district court granted on December 30, 1993. Trustees filed a motion for rehearing and reconsideration in light of the decision Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.), 10 F.3d 944 (2d Cir. 1993) [hereinafter Chateaugay II], which the court denied. The Trustees filed a timely notice of appeal. We have jurisdiction pursuant to 28 U.S.C. § 158(d).

## II.

### DISCUSSION

#### A.

The merits issues on which the parties divide present interesting and challenging questions of first impression for this court, and some appear not to have decided by any appellate court. The Trustees argue that neither the Bankruptcy Code nor any reliable precedent supports the bankruptcy court's holding that a creditor must file a motion to lift the automatic stay as a prerequisite to seeking adequate protection. They argue that this is a matter of law that this court can decide de novo even though the district court did not reach the issue. They further argue that the bankruptcy court's finding that there was no diminution in the market value of the Trustees' collateral after they filed their Lift-Stay Motion was clearly erroneous. Finally, they argue that the bankruptcy court erred as a matter of law in denying the motion for the establishment of a cash deposit.

Not surprisingly, Continental, as appellee, defends both the bankruptcy court's legal determination that the Trustees could not assert adequate protection claims for alleged market value decline during the period before they moved for relief from the automatic stay and its factual conclusion that there had been no substantial decline

7

the value of the collateral since the Lift-Stay Motion was filed.  Finally, it argu

in any event the Trustees could not recover for adequate protection because the val

the collateral did not decline below its value on the petition date, which Continer

contends is the relevant measure.

We would reach these issues only if we were satisfied that the district c

erred in holding that the Trustees' appeals to it were moot, a decision as to which

parties vigorously disagree.  Mootness <u>vel non</u> of the appeals before the district c

closely related to, if not indistinguishable from, the question whether the appeal

court is moot, an issue which Continental alludes to in its brief.  For convenience

will refer to mootness in the district court unless we state otherwise.

Continental does not contend that the appeals to the district court or to

were moot in the constitutional sense, implicating the case or controversy requirem

Article III, §1.  <u>See, e.g.,</u> <u>Preiser v. Newkirk</u>, 422 U.S. 395, 401-02 (1975). This

a situation analogous to those where the appeals became moot because the law at iss

repealed, <u>see</u> <u>Diffenderfer v. Central Baptist Church</u>, 404 U.S. 412, 414-15 (1972);

subject of the election campaign controversy was no longer a candidate, <u>see</u> <u>Golden</u>

<u>Zwickler</u>, 394 U.S. 103, 109-10 (1969); or the railroad whose application for tariff

contested withdrew that application, <u>see</u> <u>A.L. Mechling Barge Lines, Inc. v. United</u>

368 U.S. 324, 329-30 (1961).

Indeed, as the Supreme Court has recently explained, an appeal is moot in

constitutional sense only if events have taken place during the pendency of the app

that make it "impossible for the court to grant 'any effectual relief whatever.'"

<u>of Scientology v. United States</u>, 506 U.S. 9, ___, 113 S. Ct. 447, 449 (1992) (quoti

<u>Mills v. Green</u>, 159 U.S. 651, 653 (1895)).  An appeal is not moot "merely because a

cannot restore the parties to the <u>status quo ante</u>.  Rather, when a court can fashio

form of meaningful relief,' even if it only partially redresses the grievances of t

8

prevailing party, the appeal is not moot." RTC v. Swedeland Dev. Group, Inc. (In r

Swedeland Dev. Group, Inc.), 16 F.3d 552, 560 (3d Cir. 1994) (in banc) (quoting Chu

Scientology, 113 S. Ct. at 450). Thus, in Isidor Paiewonsky Assocs. v. Sharp Proper

Inc., 998 F.2d 145, 152 (3d Cir. 1993), we concluded that because we could impose a

one of the remedies enumerated by the appellant, and thereby provide it "some effec

relief," the appeal was not moot.  That is not the issue in this case.

Instead, Continental invokes the broader interpretation of mootness appli

bankruptcy cases, often referred to as "equitable mootness."  See, e.g., Manges v.

Seattle-First Nat'l Bank (In re Manges), 29 F.3d 1034, 1038-39 (5th Cir. 1994), cer

denied, 115 S. Ct. 1105 (1995); In re Specialty Equip. Cos., 3 F.3d 1043, 1048 (7th

1993);  Official Comm. of Unsecured

Creditors of LTV Aerospace & Defense Co. v. Official Comm. of Unsecured Creditors o

Steel Co. (In re Chateaugay Corp.), 988 F.2d 322, 325 (2d Cir. 1993) [hereinafter

Chateaugay I]; Rochman v. Northeast Utils. Serv. Group (In re Public Serv. Co.), 96

469, 471-72 (1st Cir.), cert. denied, 113 S. Ct. 304 (1992); First Union Real Estat

Equity & Mortgage Invs. v. Club Assocs. (In re Club Assocs.), 956 F.2d 1065, 1069 (

Cir. 1992); Central States, Southeast and Southwest Areas Pension Fund v. Central T

Inc., 841 F.2d 92, 95-96 (4th Cir. 1988); In re AOV Indus., 792 F.2d 1140, 1147 (D.

1986); Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.), 652 F.2d 793, 796-

Cir. 1981).  Under this widely recognized and accepted doctrine, the courts have he

"[a]n appeal should . . . be dismissed as moot when, even though effective relief c

conceivably be fashioned, implementation of that relief would be inequitable."  Cha

I, 988 F.2d at 325.

In a trenchant discussion of the issue in a recent decision of the Sevent

Circuit, the court noted that denominating the doctrine as "equitable mootness" is

misleading. In re UNR Indus., 20 F.3d 766, 769 (7th Cir.), cert. denied, 115 S. Ct.

9

(1994). Judge Easterbrook, writing for the court, stated: "[t]here is a big diffe

between _inability_ to alter the outcome (real mootness) and _unwillingness_ to alter t

outcome ('equitable mootness'). Using one word for two different concepts breeds

confusion." Id. (emphasis in original). Thus, although the discussions and applica

of the concept of "mootness" in bankruptcy cases by that court had previously encom

what is referred to elsewhere as "equitable mootness," see Specialty Equip., 3 F.3d

1048; In re Andreuccetti, 975 F.2d 413, 418 (7th Cir. 1992), the court in UNR Indus

stated it would now "banish 'equitable mootness' from the (local) lexicon." 20 F.3d

769. Instead, the court continued, "[w]e ask not whether this case is moot, 'equit

or otherwise, but whether it is prudent to upset the plan of reorganization at this

date." Id.

These "equitable" or "prudential" considerations focus on "concerns uniqu

bankruptcy proceedings." Manges, 29 F.3d at 1038. Whether termed "equitable mootn

a prudence doctrine, we see no reason why this court should part company with our s

circuits in their adoption of this doctrine. If limited in scope and cautiously ap

this doctrine provides a vehicle whereby the court can prevent substantial harm to

numerous parties.

The Trustees have not challenged the viability of the doctrine of equitab

mootness or application of prudential considerations in bankruptcy cases, nor have

cited to a case in any circuit that rejects the concept. Instead, they rely most h

on a decision of the Second Circuit holding that even though the reorganization pla

the bankrupt LTV Corporation had been confirmed, the appeal of tax lessors challeng

plan's failure to give their claims administrative priority was not moot. See Chat

II, 10 F.3d 944 (2d Cir. 1993). Significantly, the court in Chateaugay II did not d

with the doctrine, merely its application in that case. In fact, in RTC v. Best Pr

Co. (In re Best Prod. Co.), 68 F.3d 26, 29 (2d Cir. 1995), a more recent case from

10

Second Circuit, the court once again emphasized the language in Chateaugay I that e[ven] though an appeal may not be moot in the sense of Article III of the Constitution, i[t may] be deemed moot in bankruptcy cases because of "equitable considerations."

We have generally stated that we exercise plenary review of a district court's decision on mootness. See Northeast Women's Ctr., Inc[. v.] McMonagle, 939 F.2d 57, 61 (3d Cir. 1991); International Bhd. of Boilermakers v. Ke[lsey,] 815 F.2d 912, 914 (3d Cir. 1987). In those cases our focus was on constitutional mootness. It is surprising, but we have not seen any discussion of our standard of [review] of a district court's determination that a bankruptcy appeal to it was moot for equ[itable] or prudential reasons. Under ordinary review principles, we would review that deci[sion] for abuse of discretion. A particular case may also raise legal and/or factual iss[ues] interspersed with the prudential ones, and then the applicable review standard, ple[nary or] clearly erroneous, would apply.

## B.

Factors that have been considered by courts in determining whether it wou[ld be] equitable or prudential to reach the merits of a bankruptcy appeal include (1) whet[her the] reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not b[efore] the court, (4) whether the relief requested would affect the success of the plan, a[nd (5)] the public policy of affording finality to bankruptcy judgments. See Manges, 29 F.[3d at] 1039; Rochman, 963 F.2d at 471-72.

The foremost consideration has been whether the reorganization plan has b[een] substantially consummated, especially where the reorganization involves intricate [financial] transactions, see Rochman, 963 F.2d at 473-74 (performance under plan involved "num[erous and] complex arrangements"); Roberts Farms, 652 F.2d at 797 (plan involved "many intrica[te")]

11

involved transactions" and reversal of plan's confirmation "would knock the props o

under" such transactions and "create an unmanageable, uncontrollable situation for

Bankruptcy Court"), or where outside investors have relied on the confirmation of t

plan, see Manges, 29 F.3d at 1039 (equitable mootness "protects the interests of no

adverse third parties who are not before the reviewing court but who have acted in

reliance upon the plan as implemented"); UNR Indus., 20 F.3d at 770 ("[b]y protecti

interests of persons who acquire assets in reliance on a plan of reorganization, a

increases the price the estate can realize ex ante, and thus produces benefits for

creditors in the aggregate"); Rochman, 963 F.2d at 474 (reorganization involved $1.

billion in financing from 100,000 sources); Club Assocs., 956 F.2d at 1070 ("a numb

investors, who were not parties to this case, had committed new funds to the 'reeme

Club' with the expectation of receiving a preferred return on their investments").

"Substantial consummation" is defined in the Bankruptcy Code as: "(A) tra

of all or substantially all of the property proposed by the plan to be transferred;

assumption by the debtor or by the successor to the debtor under the plan of the bu

or of the management of all or substantially all of the property dealt with by the

and (C) commencement of distribution under the plan." 11 U.S.C. § 1101(2). In suc

instances, the strong public interest in the finality of bankruptcy reorganizations

particularly compelling.

The district court dismissed the appeals to it as moot based on the concl

set forth in its opinion dated December 30, 1993, that substantial consummation of

Plan had occurred, the Investors had already made their $450 million investment int

reorganized entity, all elements of the Plan, except distributions to the unsecure

creditors, had been completed, and a reversal of the order confirming the Plan like

would put Continental back into bankruptcy. App. at 1873. The court also noted th

12

Continental had implemented the Plan following its approval by the court because th

Trustees had failed to obtain a stay.

The Trustees do not challenge that there had been substantial consummatio

December 1993, when the district court dismissed the appeals as moot.  They suggest

as their object is not to disturb the reorganization, but only to get payment from

reorganized Continental for their adequate protection claim measured by the market

decline of the collateral during bankruptcy, the line of cases upon which Continent

relies is inapplicable.  We cannot agree, because the rejection of the Trustees' cl

the bankruptcy court was inextricably intertwined with the implementation of the

reorganization.  See AOV Indus., 792 F.2d at 1148 (to evaluate mootness, court must

"scrutinize each individual claim, testing the feasibility of granting the relief a

its potential impact on the reorganization scheme as a whole").  Thus, the Trustees

avoid the effect of the substantial consummation of the reorganization plan so read

Inasmuch as Continental agrees that the issue is not constitutional mootn

prudential mootness, we may assume that even after substantial or total consummatio

its reorganization, some effective relief would have been and still is available fo

Trustees' claim.  It is quite another matter in light of the substantial, indeed

irrevocable, change in the status quo to determine that it would have been equitabl

the court to reach the merits of the Trustees' claim.  For the district court had b

it an <u>unstayed</u> bankruptcy reorganization plan, and many courts have based their pru

decisions to decline to consider challenges to bankruptcy court orders on the groun

there has been substantial consummation of a plan of reorganization in reliance upo

unstayed confirmation order.  See, e.g., Rochman, 963 F.2d at 475.

In Chateaugay I, the court noted that although the Bankruptcy Code only r

a stay pending appeal in limited circumstances, there is a procedure under Bankrupt

8005 to seek to preserve the status quo and "[t]he party who appeals without seekin

13

avail himself of that protection does so at his own risk." 988 F.2d at 326. And i

Manges, the court observed, under the descriptive title "Halting the Runaway Train:

Motions to Stay," that "in many of the cases in which bankruptcy appeals were dismi

moot, the appellants failed to seek a stay." 29 F.3d 1039.

Even the seeking of a stay may not be enough. The appellants in In re UN

Industries had sought a stay, albeit unsuccessfully, at every opportunity; nonethel

the court noted, "[a] stay not sought, and a stay sought and denied, lead equally t

implementation of the plan of reorganization." 20 F.3d at 770. Accord AOV Indus.,

F.2d at 1144, 1146-47.

Shortly after the confirmation of the Continental Plan, the Trustees file

Emergency Motion for Conditional Stay of Order Confirming the Plan pending their ap

the district court. The condition the Trustees sought in lieu of a stay was the

establishment of a segregated account for $117 million, the full amount of their ad

protection claim, or alternatively at least $22 million, which they claim was the a

decline in the value of the collateral. See App. at 1721. In response to the cour

inquiry, they conceded that they were not willing to post any bond. The district c

never required a supersedeas bond in the amount of $450,000,000, as the dissent sug

In fact, the district court tried to ascertain the amount of bond that would be

reasonable, and the Trustees' general position was that they were "merely the fiduc

the money of their bondholders" and they suggested no lesser amount. App. at 1729.

Thus, as one of the reasons for its order denying the stay, the district

noted their unwillingness to post a bond satisfactory to the court. App. at 1756.

e.g., Central States, 841 F.2d at 95 (appellant's failure to post bond to stay

confirmation order basis for finding appeal moot). Because the failure to post the

needed to get a stay permitted the consummation of the plan, this factor weighs hea

14

favor of the district court's declination to delve into the merits of the Trustees'

appeal.

The Trustees argue that this court has held that failure to obtain a stay

not necessarily render an appeal moot. The cases to which they refer are not appos

In one, In re Joshua Slocum Ltd., 922 F.2d 1081 (3d Cir. 1990), the issue was the n

one of the power of the bankruptcy court to excise a paragraph from a shopping cent

lease. There is no indication in Slocum that there had been any confirmation of a

before or during the appeal.

In the more recent case to which the Trustees refer, Megafoods Stores, In

Flagstaff Realty Assocs. (In re Flagstaff Realty Assocs.), 60 F.3d 1031 (3d Cir. 19

the appeal also presented a narrow landlord-tenant issue, i.e. the effect of confir

of the landlord's plan on a tenant's right to pursue its appeal of the bankruptcy c

denial of its recoupment claim. In holding that it was not necessary for the tenan

seek a stay in order to pursue its right to appeal despite the confirmation in the

interim, we noted the line of cases placing recoupment and setoff in a special cate

and stated, "although we recognize the importance of maintaining the integrity of

confirmed plans from later attack, these unique circumstances permit the plan to be

reopened and readjusted." Id. at 1036. Thus, neither Flagstaff nor Slocum addresse

equitable or prudential mootness at issue here.

The Trustees argue that they had no obligation to take steps to preserve

status quo through a stay because the Plan contained "a built-in mechanism for the

confirmation] disposition and payment of Disputed Administrative Claims." Appellant

Brief at 10. Assuming arguendo, as Continental does in its brief, that the Plan

provisions for post-confirmation payment of administrative claims to the extent the

been allowed by a "Final Order," App. at 656, 691, 1057, was applicable to a claim

type and magnitude of that asserted by the Trustees, the availability of such a mec

15

does not allay all prudential and equitable concerns.  The significant fact is that

Trustees' claim was not "allowed" by the bankruptcy court before confirmation, and

such disallowance was an essential factor in the Investors' decision to proceed to

the transaction.

One of the concerns of the Investors that needed to be satisfied as a con

of their participation was that the total amount that would have to be paid for

administrative claims could be distorted by a few large claims.  These included, in

particular, labor claims by airline pilots, large claims by Eastern Airlines, and t

adequate protection claims of the Appellant Trustees.  To limit their exposure, the

Investment Agreement provided that the Investors' obligation to proceed with the

arrangements was subject, <u>inter alia</u>, to the payments and obligations for administr

claims being no higher than a specified amount.

The bankruptcy court found in its detailed Findings of Fact, Conclusions

and Order Confirming the Debtors' Revised Second Amended Joint Plan of Reorganizati

there was substantial, credible and uncontested evidence that the administrative cl

payable at confirmation would be within the specified limit of the cap set forth in

Investment Agreement. It found that neither the pilots' claims nor the Eastern clai

entitled to administrative priority, and that the Trustees' adequate protection cla

no value as an administrative claim.  It based its statutorily required determinati

the Plan was feasible, <u>see</u> 11 U.S.C. § 1129(a)(11), in part on these findings.  App

1548-53.

High on the list of prudential considerations taken into account by court

considering whether to allow an appeal following a consummated reorganization is th

reliance by third parties, in particular investors, on the finality of the transact

<u>See</u> <u>Manges</u>, 29 F.3d at 1039 ("[t]he concept of 'mootness' from a prudential standpo

protects the interests of non-adverse third parties who are not before the reviewin

16

but who have acted in reliance upon the plan as implemented"); <u>Rochman</u>, 963 F.3d at

(similar).  It seems to be uncontested that if the Trustees' claims at issue here h

approved as administrative claims, the total such claims would have greatly exceede

cap specified by the Investors for that purpose.  This would have given the Investo

option to withdraw; such withdrawal would have placed the entire Plan in jeopardy.

The district court specifically found, in dismissing the Trustees' appeal

moot, that the Investors had relied on the bankruptcy court's order and that there

integral nexus between the investment and the success of the Plan.    The court sta

"[t]he Investors relied on the unstayed Confirmation Order in making the $450 milli

investment in Continental's Plan.  It is clear that [the Trustees'] requested relie

deposit of $22 million to $117 million for that administrative claim] would undermi

grounds which the Investors relied upon in making their investment and would requir

dismantling of the entire Plan."  App. at 1874.  Although the Trustees argue that t

finding is erroneous, there is support for it in the record.

At the hearing in April 1993 before the district court on the Trustees' m

for the conditional stay of the Confirmation Order, counsel for the Trustees stated

had testimony that "as a matter of business judgment, it would be extremely unlikel

the investors to walk away from this deal if . . . a 22-million-dollar deposit was

established."  App. at 1727.  The Trustees' counsel in effect challenged the Invest

assert otherwise, stating that inasmuch as the Investors' counsel were in court the

correct any assertions that he made.  <u>Id.</u>   Thereafter, the Investors' attorney ros

make clear the [I]nvestors' position, which is that if the relief is granted to [th

Trustees] which they seek from the Court this morning [the stay conditioned on a de

of some $22 million to $117 million], then we are not prepared to close the transac

App. at 1744.

17

The representative of the Investors explained that in the airline busines

"there is a great sensitivity to cash and the capital structure of a reorganized en

and that the relief that the Trustees sought "could significantly impair the capita

structure that would exist with respect [to] this reorganized airline."  Id. at 174

He reviewed the negotiations that had occurred for the cap for administrative exper

liability, advised that the Investors had monitored on a monthly basis Continental'

performance in that respect, explained that the Investors had insisted that the

confirmation order address the issue of the Trustees' claim "because we want to mak

if we are putting our money in, we are getting the benefit of our bargain, which is

reorganized entity with a capital structure that we contemplated."  App. at 1746.

concluded by stating unequivocally that if a stay were entered conditioned upon the

the Trustees sought, then his client "would not be prepared to close this transacti

Id.  The Trustees' counsel did not thereafter argue that the Investors' counsel's

statements were insufficiently probative, and therefore that suggestion here is les

persuasive.

In response to this evidence of reliance, the Trustees now argue that whe

Investors closed the transaction they were aware that they were taking a risk that

Trustees would be successful on appeal on the law or facts supporting their claim.

record shows, however, that all parties were well aware of the extensive legal prec

dismissing as moot appeals from unstayed consummated reorganizations.  See App. at

(references in the Investment Agreement); App. at 1729-30, 1741 (argument before th

district court on the stay).  In light of the long line of cases that recognize the

prudential considerations that militate against upsetting expectations that formed

integral part of a complex reorganization, we decline to hold that the Investors we

unreasonable in proceeding with their investment in reliance on the confirmation or

By the time the district court ruled, it was no longer possible to restore the part

18

their earlier positions because the investment had been made, and the option to wit

because the administrative claims exceeded the cap was no longer available to the

Investors.  See Specialty Equip., 3 F.3d at 1049 (claim held moot when its acceptan

"would amount to imposing a different plan of reorganization on the parties").

The Trustees have not presented us with any arguments, other than the

availability of the post-confirmation mechanism for administrative claims, which wo

weigh against all of the prudential considerations that dictate that this consummat

reorganization must be left in place.  Following confirmation, Continental was oper

as a restructured company, and had entered into countless new relationships and

transactions.  To convince a court to take the action sought by the Trustees which

undermine the basis for the Investors' decision to proceed, the Trustees would have

proffer a powerful reason indeed. They have not even attempted to do so.

Our dissenting colleague does not disagree with the concept, unchallenged

Trustee and universally accepted elsewhere, that equitable considerations may make

imprudent to upset a consummated reorganization plan.  Nor do we understand the dis

take issue with our identification of the five considerations relevant to applicati

that doctrine, by whatever name it is denominated.  Instead, the dissent merely dis

with application of that doctrine in this case, based on the dissent's view that th

Investors factored the possibility of a reversal into their investment decision, an

dissent's "serious doubt" that the Investors banked on the 100% probability that th

Trustees would recover nothing.  Record support for the dissent's view has not been

and the district court, which was far closer to the parties and the events than we

made a finding that there was such reliance by these Investors.  See App. at 1874.

event, the district court did not base that finding on any "100% probability" facto

issue the dissent has created.

19

Even more important, the district court reached its conclusion based on m[...] than one consideration, principally the facts that the reorganization plan was consummated, no stay was obtained, numerous other parties have changed their positi[...] and numerous irrevocable transactions have since been completed as a result of the consummation of the Plan.

Without listing all of such transactions set forth by Continental in its [...] we note that among those are the distribution to unsecured creditors, the merger of [...] debtors other than Continental with and into Continental, the investment of $110 mi[...] in cash by Air Partners and Air Canada in the reorganized Continental, the transfer [...] foreign governments of various route authorities, and the assumption by the reorgan[...] Continental of unexpired leases and executory contracts worth over $5.0 billion. [...] the "key issue" really is whether the district court abused its discretion in weigh[...] various equitable factors. While a judge on this court might reach a different equ[...] balance, we are not prepared to hold that the balance reached by the district court [...] abuse of its discretion.

Under the circumstances presented here, we can see no prudential consider[...] that would support an attempt by an appellate court, district or court of appeals, [...] fashion even a limited remedy for the Trustees. That would necessarily entail impo[...] new debt on the reorganized company, which is a different entity than it was when t[...] case was before the district court. Thus, we agree with the determination of the [...] court that the Trustees' claim was moot. We base our holding on our conclusion tha[...] would be neither prudent nor equitable to grant the Trustees the relief they seek.

### III.

### CONCLUSION

For the reasons set forth we will affirm the order of the district court.

In Re:  Continental Airlines
No. 94-7748


ALITO, Circuit Judge, dissenting:

The majority's decision in this case is disturbing. Much is at stake.  Th[e] appellants (the "Trustees") have raised what the majority itself characterizes as "interesting and challenging questions of first impression for this court," some of [which] "appear not to have been decided by any appellate court."  Maj. Op. at 8.  The dist[rict] court ruled that the Trustees' arguments were likely to prevail on appeal.  J.A. 1[7.] The case is clearly not moot in the sense that the courts lack the ability to prov[ide] meaningful relief, and it seems obvious that the Trustees could receive at least so[me] relief without undermining the plan of reorganization.  Indeed, the plan itself con[tains a] mechanism for providing such relief, and Continental represented in the bankruptcy [court] that the Trustees would be paid under this provision if their claim was allowed. De[spite] all this, both the district court and the majority have refused to consider the Tru[stees'] arguments and have thus left them without a decision on the merits by any Article I[II] court. In producing this result, the majority relies on considerations of "prudence[" and] "equity," but in my view such considerations weigh strongly in favor of entertainin[g the] Trustees' arguments.

21

The majority begins its analysis by identifying five factors that have be

considered by other courts "in determining whether it would be equitable or prudent

reach the merits of a bankruptcy appeal." Maj. Op. at 14. These are: "(1) whether

reorganization plan has been substantially consummated, (2) whether a stay has been

obtained, (3) whether the relief requested would affect the rights of parties not b

the court, (4) whether the relief requested would affect the success of the plan, a

the public policy of affording finality to bankruptcy judgments." Id.

In this case, however, these five factors seem to boil down to basically

i.e., whether entertaining the Trustees' claim on the merits would upset any reason

reliance interests. This is the essence of the third factor listed by the majority

"whether the relief requested would affect the rights of parties not before the cou

The fourth factor -- "whether the relief requested would affect the success of the

- cannot justify the majority's decision to preclude the Trustees from getting any

(Whether or not the plan of reorganization would be imperilled if the Trustees were

awarded the full measure of relief that they seek -- a matter of sharp dispute[1] --

could plausibly argue that the Trustees cannot be given any relief without endanger

---

[1]The district court wrote that "if the Court were to reverse the order confirming t
Plan, it would likely put Continental back into bankruptcy." J.A. 1873. However,
Trustees argue:

> It is difficult to conceive how a reorganization -- such as Continental's
> that involved the restructuring of over $71 billion in debt, and resulted
> shareholder equity of $610 million, could somehow become financially impe
> by the allowance of the Trustees' adequate protection claim. . . . Indee
> a single shred of evidence exists in the record to indicate -- or even su
> - that Continental would be compelled to dismantle its Plan or to file an
> bankruptcy if the Trustees were to prevail on their adequate protection c

Appellants' Br. at 24 (emphasis in original; citations omitted).

plan.)   And the remaining factors seem to be largely, if not entirely, subsumed wi

factors three and four.[2]

For these reasons, it seems to me that the key issue in this case is whet

investors in NewCal (the "Investors") or others reasonably relied on the prediction

the Trustees would recover nothing on their claim.[3]  If they did, then it might be

to upset their reliance interests.  If they did not, I see nothing unfair about

entertaining that claim on the merits.

In considering the question of reliance, I will start with the Investors

their plight looms large in the analyses of the majority and the district court.  W

Investors decided to invest $450 million in NewCal they knew or should have known t

under the reorganization plan NewCal would be required to pay the Trustees' claim i

was ultimately allowed.  Section 10.1 of the plan provided that NewCal would pay "A

Administrative Claims."  **Moreover, in order to persuade the bankruptcy court to re**

**Trustees' request that a cash reserve be established prior to confirmation to cover**

**claim, Continental argued that such a reserve was unnecessary because if the Truste**

**claim was allowed it would be "an Allowed Administrative Claim which would be paid**

**accordance with the terms of Section 10.1 of the Plan."  J.A. 1039.**  In addition, w

---

[2]   As the majority seems to recognize (see Maj. Op. at 14), the first factor
(substantial consummation) is important in large part because investors and others
likely to have relied on a plan once this stage is reached.  In addition, I would s
that substantial consummation also marks the point at which the policy against dist
a reorganization plan (factor four) comes prominently into play.  The same would ap
be true of the second factor (the absence of a stay) since, as the majority notes (
Op. at 15), the lack of a stay "permit[s] substantial consummation."  Maj. Op. at 1
And as for the fifth factor ("the public policy of affording finality to bankruptcy
judgments"), if entertaining the Trustees' appeal would not upset reasonable relian
interests or undermine the reorganization, it is difficult to see why this public p
would be offended.

[3] Continental frames the central issue in similar terms, stating: "The relevant ques
. . . whether providing the requested relief would inequitably injure the interests
those whose actions in reliance upon the unstayed Confirmation Order resulted in
substantial consummation."  Appellee's Br. at 11.

23

Investors made their investment, the bankruptcy court's denial of the Trustees' cla[im] already on appeal to the district court. Under these circumstances, any prudent in[vestor,] in deciding whether to invest in NewCal on particular terms, would have taken into [account] the range and likelihood of possible outcomes in the Trustees' appeal, including th[e] possibility that the appeal would be successful in whole or in part. No reasonable investor would have proceeded on the assumption that there was a 100% probability t[hat the] Trustees would recover nothing. Consequently, we would not be upsetting any reason[able] reliance interests by holding that the Trustees' arguments should be considered on [the] merits.

> In response to this argument, the majority writes:
> The record shows . . . that all parties were well aware of the
> extensive legal precedent dismissing as moot appeals from unstayed
> consummated reorganizations. . . . In light of the long line of cases
> that recognize the prudential considerations that militate against
> upsetting expectations that formed an integral part of a complex
> reorganization, we decline to hold that the Investors were
> unreasonable in proceeding with their investment in reliance on the
> confirmation order.

Maj. Op. at 23.

If I correctly understand this passage, its reasoning is circular. Accor[ding to] the majority, it was reasonable for the Investors to rely on the Trustees' losing b[ecause] the Investors had a reasonable basis for concluding that if they reasonably relied [on the] Trustees' losing the Trustees would lose. And of course the Trustees would lose be[cause] the Investors reasonably relied on the Trustees' losing because of the Investors' [own] reasonable reliance on the Trustees' losing as a result of the Investors' reasonabl[e] reliance . . . .

The plain fact is that the Investors did not act reasonably or prudently [if they] relied on a calculation that there was a 100% probability that the Trustees' claim

24

completely fail.[4]  (Such reliance would have been no more reasonable than reliance

calculation that there was a 100% probability that fuel prices would not increase o

any other contingency that might harm the company would not come to pass.) Instead,

Investors acted reasonably and prudently, they factored into their investment decis

the possibility that the Trustees would be successful in whole or in part.[5]  And th

is true of the other parties that relied on the plan.  These parties, no less than

Investors, should have known that NewCal was obligated under section 10.1 of the pl

pay allowed administrative expenses and that Continental had obtained an important

from the bankruptcy court by representing that the Trustees' claim if allowed would

paid by NewCal under this provision.

In sum, entertaining the Trustees' claim on the merits would not upset an

reasonable reliance interests.  Nor would the mere act of entertaining those claims

imperil Continental's reorganization.  If the Trustees' claim was considered and th

on the merits (by no means a foregone conclusion), any threat to the reorganization

---

[4]The majority says that the "`100% probability' factor [is] an issue the dissent ha
created."  Maj. Op. 25.  However, this "factor" is implicit in the majority's reaso
If a reasonable investor would have proceeded on the basis of the calculation that
was, let us say, a 50% probability the Trustees would ultimately recover something
their claim, then I fail to see how we would necessarily be upsetting a reasonable
reliance interest by holding that the Trustees' claim had to be entertained on the
[5]Although actual but unreasonable reliance interests are not relevant here, I must
an aside that I seriously doubt that the Investors banked on a calculation that the
a 100% probability that the Trustees would recover nothing.  The majority suggests
the district court made a "finding" that the Investors did so, but I am not sure th
majority has correctly interpreted what the district court wrote.  The district cou
stated:  "The Investors relied on the unstayed confirmation order in making the $45
million investment in Continental's Plan."  J.A. at 1874.  This may mean no more th
the Investors, in deciding to commit the $450 million, took into account the fact t
plan had been confirmed and had not been stayed.  Taking these facts into account (
would certainly have been reasonable) is quite different from relying on a 100%
probability that the Trustees' claim would be entirely unsuccessful.  In any event,
district court meant to say the latter, neither the district court's opinion,
Continental's brief, nor the majority's opinion cites any support in the record for
remarkable "finding."

be taken into account in framing the Trustees' relief. What the district court an[d]

majority have done -- throwing the Trustees out of court before the merits of their [...]

are even heard -- is unjustified and unjust.

I find it ironic that the majority invokes equity to support this result[.]

noted, Continental argued in the bankruptcy court that the Trustees' claim, if allo[...]

would be "an Allowed Administrative Claim which would be paid in accordance with th[...]

of Section 10.1 of the Plan." J.A. 1039. Now, Continental contends that the Trust[...]

claim, even if valid on the merits, should not be paid under this provision. Reward[...]

such a volte-face is not my idea of equity.

I am also concerned about the implications of this decision for future ca[...]

The majority's decision may make it imperative for appellants in cases like this to [...]

stays. If these appellants must post a bond in order to get a stay, then I questio[...]

whether a stay is a realistic option in reorganizations of companies like Continent[...]

And if a stay is not a realistic option in such cases, then bankruptcy judges will [...]

exercise a distressing measure of essentially unreviewable authority.

For these reasons, I respectfully disagree with the majority's decision. [...]

would reverse the order of the district court and remand for a decision on the meri[...]

---

[6]In this case, Continental sought a supersedeas bond in the amount of $450,000,000. [...]
J.A. at 1973. If a bond of anything approaching this magnitude is required in case[...]
this type in order to obtain a stay, then a stay may not be realistic.