In re ARTRA GROUP, INC., Debtor.

Official Committee of Unsecured Creditors of Artra Group, Inc., Plaintiff,

v.

Artra Group, Inc. and Entrade, Inc., Defendants.

Bankruptcy No. 02 B 21522.
Adversary No. 02 A 01086.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Sept. 30, 2003.

Frances Gecker, Neal, Gerber & Eisenberg LLP, Chicago, IL, for Plaintiff.

James A. Chatz, Arnstein & Lehr, Chicago, IL, for Defendant Artra Group, Inc.

Bryan I. Schwartz, Boehm & Pearlstein, Ltd., Chicago, IL, Philip E. Ruben, Levenfeld & Pearlstein, Northfield, IL, for Defendant Entrade, Inc.

## MEMORANDUM OPINION
## AND ORDER

PAMELA S. HOLLIS, Bankruptcy Judge.

This matter comes before the court on the Committee's Motion for Authority to Settle Adversary Proceeding and Approve Settlement Agreement. The Muralo Company ("Muralo") objects to the release and injunction contained in the settlement, arguing that it is improper to enjoin Muralo from claims it holds directly against nondebtors and to release non-debtor tortfeasors in this settlement. The court will not approve the Permanent Injunction contained in the proposed settlement. Unless the parties waive the Permanent Injunction as a condition to the settlement, or amend the agreement pursuant to Section 9(d), the settlement agreement is null and void.

## BACKGROUND

In 1975, Artra acquired Synkoloid through a series of transactions, and assumed all of Synkoloid's liabilities arising after 1962. Eventually it became apparent that those liabilities were massive, because Synkoloid allegedly manufactured products that contained asbestos. As of December 31, 2000, Artra was a defendant in pending lawsuits involving over 46,000 plaintiffs asserting claims related to Synkoloid's products.

In September 1999, Artra became a wholly-owned subsidiary of Entrade. In October 1999, Entrade purchased the stock of Nationwide for, among other consideration, $14,000,000 in long term promissory notes. Entrade has never been able to meet its obligations under these notes. As a result, Artra made numerous loans to Entrade that the Committee alleges were funded, at least in part, by the proceeds of settlements between Artra and its insurance companies. These settlements involved Artra releasing the insurance companies from all further obligations and the insurance companies paying a fixed sum of money to Artra with the condition that the monies be used by Artra solely for the defense of asbestos-related lawsuits and the payment of asbestos-related claims. The Committee brought this adversary proceeding to recover assets it alleged were diverted from the Debtor to Entrade by seeking to substantively consolidate the Debtor and Entrade.

Muralo objects to the proposed settlement of this adversary proceeding. In 1981, Artra sold Synkoloid's, paint products, materials, inventory and assets to Muralo. The Asset Purchase Agreement provided that Artra would indemnify and hold Muralo harmless from product liability claims. As a result of this asset purchase, Muralo also became the target of numerous asbestos related lawsuits. Muralo filed its own Chapter 11 in New Jersey on May 20, 2003. Shortly thereafter, Muralo filed an adversary proceeding against Entrade and "insiders" of Entrade

alleging in part that the defendants fraudulently induced Muralo to release its indemnification claims against certain Artra insurers. Muralo states that allegations in its adversary proceeding "...are identical to those alleged by the Committee..." in this adversary case. Muralo Objection at p. 4. Muralo does not take issue with the amount of the proposed settlement, but objects to the permanent injunction as too broad and contrary to Bankruptcy Rule 7001, which requires an adversary proceeding against potentially enjoined parties.

## ANALYSIS

██ "The benchmark for determining the propriety of a bankruptcy settlement is whether the settlement is in the best interests of the estate." *Matter of Energy Coop., Inc.*, 886 F.2d 921, 927 (7th Cir. 1989). The value of the proposed settlement must be "reasonably equivalent" to the value of the surrendered claim; the test is "whether or not the terms of the proposed compromise fall within the reasonable range of litigation possibilities." *Energy Cooperative*, 886 F.2d at 929 (citations omitted). The settlement need only surpass "the lowest point in the range of reasonableness." *Id.* (citations omitted).

██ Factors the court may consider include: (1) comparing the settlement's terms with the probable costs and benefits of litigation; (2) the litigation's complexity and probability of success; (3) the expense, inconvenience, or delay if the litigation continued; and (4) any creditor's objections to the settlement. *In re American Reserve*, 841 F.2d 159, 161–162 (7th Cir.1987).

In this case, the Committee filed an adversary proceeding seeking to substantively consolidate Artra with Entrade. According to the complaint, Artra loaned at least $6,180,000 of its insurance settle-

ments to Entrade and is depleting its remaining assets for Entrade's benefit.

In the settlement agreement, Entrade agrees to pay the estate $5 million dollars, comprised of a cash payment of $3 million and a promissory note for $2 million secured by an irrevocable letter of credit. According to the motion to approve this agreement, the Committee's financial advisor extensively investigated Entrade and its only valuable asset, Nationwide. Based on this analysis, the Committee submits that the amount of the settlement "is commensurate with the present value the estate would receive" if the Committee prevailed in its complaint and substantively consolidated Entrade with Artra. By reaching this settlement before the litigation progresses further, the Committee avoids incurring significant costs. It appears that the dollar value of this settlement is at least above the lowest point in the range of reasonableness. *Newman v. Stein*, 464 F.2d 689 (2nd Cir.1972), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972).

██ However, the settlement involves more than just dollars. As many settlement agreements do, this one contains a release. In this release, "each of the ARTRA Entities, the Committee and the Future Claimants Representative hereby fully, finally and completely release and discharge Entrade and each of the Entrade Released Parties [the Selling Shareholders, Nationwide, Entrade, its subsidiaries, John Conroy, and all of their respective officers, directors, shareholders, employees, agents, and attorneys, past and present] ... for any and all claims....". The release is not limited to claims based on Artra's loans to Entrade but encompasses any and all claims the parties to this adversary might have, "of any kind or nature whatsoever." This release appears to be appropriate as part

of this settlement agreement. The Committee initiated the adversary proceeding, and engaged in negotiations with Entrade, Artra, and the Future Claims Representative to resolve the proceeding amicably. No other entity is bound by this release.

However, one of the conditions precedent to the settlement agreement is the issuance of a permanent injunction covering non-debtors Entrade and the "Entrade Released Parties". The language of the permanent injunction is attached to the agreement as Exhibit A, and provides in part that:

> All entities which have held or asserted, which hold or assert, or which may in the future hold or assert any claim, demand, or cause of action ... including, but not limited to, all claims in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, against Entrade or the Entrade Released Parties ... based upon, relating to, arising out of, or in any way connected with ARTRA, Inc. [and each of its subsidiaries] ... shall be permanently enjoined, stayed, and/or restrained, from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim, demand, or cause of action, against the Covered Parties from the date of this order until the Bankruptcy Case is resolved by confirmation of a Plan of Reorganization, which includes a Channeling Injunction in favor of Entrade and the Entrade Released Parties.

The scope of this Permanent Injunction is breathtaking. The Committee proposes to bind any entity that might have any sort of claim whatsoever against Entrade, its insiders or subsidiaries if such claim is in anyway connected with Artra or its subsidiaries.

■■ Pursuant to section 105 of the Bankruptcy Code, this court has the power to enter an injunction *temporarily* blocking the adjudication of claims that are not property of the estate, but are related to a trustee's work on behalf of the estate. See *Fisher v. Apostolou,* 155 F.3d 876, 882 (7th Cir.1998). This court "...can enjoin proceedings in other courts when it is satisfied that such proceedings would defeat or impair its jurisdiction over the case before it." *In re L & S Industries, Inc.,* 989 F.2d 929, 932 (7th Cir.1993). *See also Celotex Corporation v. Edwards,* 514 U.S. 300, 308–310, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995), which holds that while non-debtor injunctions may issue under 11 U.S.C. § 105, the power is limited to matters "related to" the debtor's bankruptcy estate.

■ The injunction proposed here raises serious jurisdictional concerns. One example of the breadth of this injunction demonstrates how it prohibits litigation over which this court has no jurisdiction. "Entity" as defined in the Bankruptcy Code at 11 U.S.C. § 101(15) includes "government unit." If one of the Entrade Released Parties provided material inside information to a person in connection with the offer or sale of securities of any of the Artra entities, the Securities Exchange Commission would be barred by this injunction from pursuing the matter. It is not within this court's jurisdiction to prevent such an action, which would have no effect whatsoever on the bankruptcy estate and would not be "related to" this bankruptcy case under even the most expansive definition of bankruptcy jurisdiction.

In addition to § 105, § 524(g) authorizes permanent channeling injunctions against non-debtors in asbestos cases if certain tests are met. *See* 11 U.S.C. § 524(g).

This is an asbestos related case, but the Debtor has yet to confirm a plan, so § 524(g) is not applicable at this stage. 11 U.S.C. 524(g)(3)(A). Although § 524(g) is not the exclusive path to obtaining a non-debtor injunction [1], restraining orders that permanently release claims of non-debtors against non-debtors are controversial. In the context of considering a plan of reorganization, the Seventh Circuit has thus far approved only release provisions binding parties who voted for confirmation. In *Specialty Equipment,* the court deemed a vote in favor of a plan containing such releases to be consent to them, which the court has both the jurisdiction and power to approve. *In re Specialty Equipment Companies, Inc.,* 3 F.3d 1043, 1045–46 (7th Cir.1993). It adopted the view of courts who "have found releases that are consensual and non-coercive to be in accord with the strictures of the Bankruptcy Code." *Id.* The *Specialty Equipment* court found that each creditor could choose to grant or not grant the releases by voting in favor or against the plan, and stated that "a creditor who votes to reject the Plan or abstains from voting may still pursue any claims against third-party nondebtors." *Id.* The court specifically noted that the releases would present a "knotty problem" if they were not consensual, suggesting that significant issues would be raised if they bound any parties other than those voting in favor of the plan.

In this case, the Committee asks the court to go much further than the *Specialty Equipment* decision and enter an injunction, not in a plan, but in a settlement agreement. This injunction would bind dissenting parties with or without notice, encompassing all entities anywhere with any sort of claim against Entrade, so long as it has some relation to Artra.

Most commentators agree that bankruptcy court lacks power to permanently enjoin one non-debtor from suing another non-debtor, especially when the enjoined party objects or does not consent:

> Based on all of the foregoing, the only possible conclusion is that involuntary releases that automatically bind all parties merely by virtue of plan confirmation, including those who reject the plan of reorganization, are unacceptable, even in those instances where the "injunction favoring factors" exist. With two exceptions, objecting parties ought to have an absolute right to block confirmation until the plan is modified to excise the offending release provision. The first exception involves creditors who are being paid in full promptly and, hence, would be functionally unimpaired. The other exception is for injunctions in asbestos cases that fit within §§ 524(g) and (h). Even though the Supreme Court decision in Celotex suggests that the bank-

---

1. The legislative history notes:

   Section 111(b) ... make[s] clear that the special rule being devised for the asbestos claim trust/injunction mechanism is not intended to alter any authority bankruptcy courts may already have to issue injunctions in connection with a plan [of] reorganization. Indeed, [asbestos suppliers] Johns–Manville and UNR firmly believe that the court in their cases had full authority to approve the trust/injunction mechanism. And other debtors in other industries are reportedly beginning to experiment with similar mechanisms. The Committee expresses no opinion as to how much

   authority a bankruptcy court may generally have under its traditional equitable powers to issue an enforceable injunction of this kind. The Committee has decided to provide explicit authority in the asbestos area because of the singular cumulative magnitude of the claims involved. How the new statutory mechanism works in the asbestos area may help the Committee judge whether the concept should be extended into other areas.
   *Vol. E., Collier on Bankruptcy, at App. Pt. 9–78* (reprinting legislative history pertaining to the 1994 Code) (amendments).

ruptcy court has jurisdiction to consider an involuntary release provision and attendant injunction, the court does not have the power to enforce that provision over the objection of an impaired creditor under § 105(a) or any other provision of the Code—even assuming that we get past the § 524(e) potential roadblock in the first place.

Meltzer, Peter, "Getting Out of Jail Free: Can the Bankruptcy Plan Process Be Used to Release Nondebtor Parties?" *71 Am. Bankr.L.J. 1* (1997) at 41 (footnotes omitted).

*See also,* Brubaker, Ralph, "Bankruptcy Injunctions And Complex Litigation: A Critical Reappraisal Of Non–Debtor Releases In Chapter 11 Reorganizations", *1997 U. Ill. L.Rev. 959* (1977), and Cole, Marcus G., "A Calculus Without Consent: Mass Tort Bankruptcies, Future Claimants, and the Problem of Third Party Non–Debtor 'Discharge' ", *84 Iowa L.Rev. 753, (1999)* at 799–800:

The rising number of mass tort cases evolving into bankruptcy proceedings has spurred the development of creative mechanisms to spread the benefits of bankruptcy beyond the bankrupt. One outgrowth of this trend is the concept of the third party non-debtor discharge. These de facto discharges of third parties have taken the form of releases or injunctions within the context of chapter 11 plans of reorganization. Typically, an interested third party, under one of these arrangements, contributes to the debtor's reorganization in exchange for freedom from certain related lawsuits. Courts, practitioners and commentators are in disagreement as to whether these types of arrangements are consistent with the broad equitable powers granted to courts under section 105 of the Code, or whether section 524(e) prohibits such arrangements as effecting a discharge of

a non-debtor. In the view of the author, such agreements involve neither section 105 nor section 524. Instead, these settlements may be viewed as ordinary, enforceable contracts under state law, so long as they are between consenting parties. Potential claims that have yet to accrue under state tort law, however, are not of a nature that permit consensual resolution of them. Accordingly, third parties cannot receive a release or "discharge" of these future claims.

Where bankruptcy courts prohibit consensual releases between third parties and creditors, or permit a third party non-debtor "discharge" of future claims, they are engaged in judicial overreaching unwarranted by the circumstances, unauthorized by the Code, and destructive of the rule of law.

Aligned with these commentors is Judge Katz's opinion in *In re Sybaris Clubs International, Inc.,* 189 B.R. 152 (Bankr. N.D.Ill.1995), holding that a bankruptcy court lacked power to issue a non-consensual injunction barring a creditor's actions against a non-debtor. Nevertheless, in *Fogel v. Zell,* 221 F.3d 955 (7th Cir.2000), the Seventh Circuit declared that such an injunction is permissible if limited to property of the estate:

Had Denver never become a party to the Madison bankruptcy proceeding, the injunction against its prosecuting its own suit against Zell and the others could not have been issued. Enjoining nonparties is not completely out of the question for a bankruptcy court, but it is a stretch. If A has a claim against B, it is easy to see why B would like to have a settlement that resolved not only its dispute with A but its dispute with C as well, and it is easy to see why A would be delighted to agree to such a provision since by making the settlement more valuable to B the provision would enable

A to get a larger settlement—this is the reason the district judge gave for approving the settlement. But two parties cannot agree to extinguish the claim of a third party not in privity with either of them—let alone the potential claims of 10,000 third parties. E.g., *Martin v. Wilks*, 490 U.S. 755, 761–62, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989); *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 529, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986); *United States v. Board of Education*, 11 F.3d 668, 672–73 (7th Cir.1993); *Lindsey v. Prive Corp.*, 161 F.3d 886, 891 (5th Cir. 1998).

Like most legal generalizations, this one requires qualification. If C is required to file its claim against A in the litigation between A and B, and fails to do so, the settlement of that litigation can extinguish C's rights. *Martin v. Wilks*, supra, 490 U.S. at 762 n. 2, 109 S.Ct. 2180. That is paradigmatic of bankruptcy—and the defendants' first argument, which we've rejected, for binding Denver to the settlement. In addition, the court can enjoin a third party from interfering with the disposition of the property in the debtor's estate, *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998); *Zerand–Bernal Group, Inc. v. Cox*, 23 F.3d 159, 161–62 (7th Cir.1994), just as an ordinary injunction can be made to run against third parties who have notice of it, in order to prevent interference with it. And thus when an asset of the estate is sold by the trustee in bankruptcy free and clear of any liens, the court can enjoin a creditor from suing to enforce a preexisting lien in the asset. 11 U.S.C. § 363(f); *In re Penrod*, 50 F.3d 459, 461 (7th Cir.1995); *Zerand–Bernal Group, Inc. v. Cox*, supra, 23 F.3d at 163; *Gotkin v. Korn*, 86 U.S.App. D.C. 372, 182 F.2d 380, 382

(D.C.Cir.1950); *In re WBQ Partnership*, 189 B.R. 97, 110 (Bankr.E.D.Va.1995).

> 221 F.3d at 964–965.

This distinction was recognized in *In re Mrs. Weinberg's Kosher Foods, Inc.*, 278 B.R. 358 (Bankr.S.D.N.Y.2002). That court approved an injunction enjoining creditors from prosecuting direct claims that were derivative of the estate's claims against parties that had allegedly engaged in a fraudulent transfer. However, the observed that a creditor might hold a personal, independent claim ... that does not implicate an injury to the estate.... The trustee would lack the right to assert or settle such a claim, and similarly, the bankruptcy court would lack the power to enjoin its prosecution through a channeling injunction imposed as part of a settlement *Id.* at 365–366. Therefore, the *Mrs. Weinberg's* court asked the parties to clarify their injunction "to reflect that it bars creditors from asserting claims against Pitney or Burrick that arose from the facts and transactions underlying the Pitney Claims, and are based upon or derivative of injuries to the debtor or the estate." *Id.* at 366.

Similarly, an injunction that bars creditors from asserting claims based on the transactions described in the Committee's adversary proceeding against Entrade, *so long as the injuries suffered were based upon or derivative of injuries to Artra or its estate*, might be permissible. However, the proposed injunction is not limited to claims owned by the debtor or derivative of the debtor's claims and ignores the distinction explained in *Fogel v. Zell*. Moreover, the Seventh Circuit's remand of a comparably broad injunction *In re Energy Coop.*, 886 F.2d 921 (7th Cir.1989) is instructive:

> Although we reject the appellants' contention that the lower court did not have jurisdiction or authority to issue the in-

junction, we do agree with their contention that the language of the injunction is overbroad. . . .

The appellants contend that this language can be construed to bar not only the causes of action against the Member–Owners which are the exclusive property of the ECI estate, but also all other claims which can be asserted against the Member–Owners in connection with their dealings with ECI. For example, an ECI creditor would be barred from pursuing a fraud claim based upon an allegation that the Member–Owners had induced the creditor to deal with ECI by representing that they had certain contractual obligations to ECI which required them to infuse capital into ECI. The above claim would be based in part on an allegation that the Member–Owners had "breached a contract with ECI" and thus prohibited by the injunction.

The district court clearly intended to limit the scope of the injunction to enjoin only those causes of action which belonged exclusively to the estate. In its opinion, the court stated that the injunction applied only to "causes of action which belong to the estate and which are part of the Trustee's settlement with the Banks and Member–Owners. No broader interpretation can or should be given to any injunction order entered as part of the settlement." The court apparently believed that its prefatory paragraph to the injunction, in which it stated that it entered the injunction "based on its findings that the claims asserted by the Trustee in the above-captioned action are the exclusive property of the ECI Estate," adequately delineated the scope of the injunction. Language delimiting the scope of the injunction, however, should be explicit and unambiguous. See Fed.R.Civ.P. 65(d). In order to prevent any confusion in the future, the order should state that only those claims which are the exclusive property of the ECI estate and are based in whole or in part on allegations (a)-(e) (see above) are enjoined. We therefore remand the injunction to the district court with instructions to modify the language of the injunction in accordance with this opinion. See *Diapulse Corp. of America v. Carba, Ltd.,* 626 F.2d 1108 (2nd Cir.1980).

*In re Energy Coop.,* 886 F.2d at 930.

Whether the claims Muralo asserted in its adversary proceeding are derivative of injuries to Artra or its estate [2] is a question that can be answered if the parties revise the settlement agreement, narrow their proposed injunction and request the court's approval. As it stands, however,

---

**2.** Given the similar circumstances between Muralo's claim in its adversary and Denver's claim in *Fogel v. Zell,* (general looting of debtor's assets) Muralo may have a difficult time establishing an independent claim:

It is true that the trustee "owns" Madison's [Debtor] claim in the loose sense that it's part of the debtor's estate, which the trustee controls. 11 U.S.C. § 541(a); *Pepper v. Litton,* 308 U.S. 295, 307, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Koch Refining v. Farmers Union Central Exchange, Inc.,* 831 F.2d 1339, 1343–44 (7th Cir.1987); *In re Ionosphere Clubs, Inc.,* 17 F.3d 600, 604 (2d Cir.1994). But the issue is Denver's claim, the claim that the adversary defendants looted Madison so that it wouldn't have any assets out of which to pay tort claims arising from the eventual bursting of the defective pipe. Denver's is thus a derivative claim, the primary victim of the fraudulent conveyance being Madison. It was Madison's assets that were conveyed away; Denver suffered only in its capacity as a potential claimant to those assets . . . *Fogel v. Zell,* 221 F.3d at 965.

Nevertheless, Muralo should be afforded a hearing on this issue if the Injunction is amended and limited to enjoining claims owned by the debtor or derivative of the debtor's claim.

the injunction in this settlement agreement cannot be approved. The court approves the terms of the settlement but not the Permanent Injunction attached as Exhibit A. Unless the parties waive the Permanent Injunction as a condition to the settlement, or amend the agreement pursuant to Section 9(d), the settlement agreement is null and void.